# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Z-MODULAR, LLC,                          )
                                              )
          Plaintiff,               )
                                              )
        v.                            )
                                              )
MCN BUILD, INC.,                         )
                                              )
          Defendant.               )     **Civil Case No. 21-2511 (RJL)**
                                              )
MCN BUILD, INC.,                         )
                                              )
          Counter-Plaintiff,       )
                                              )
        v.                            )
                                              )
Z-MODULAR, LLC,                          )
                                              )
          Counter-Defendant.       )

## MEMORANDUM OPINION
April 5, 2024 [Dkt. ##29, 33]

Plaintiff Z-Modular, LLC ("Z-Modular") brings this suit against defendant MCN Build, Inc. ("MCN"), seeking money allegedly owed to it under two contracts for modular housing units. Z-Modular has asserted four claims—two for breach of contract and two for quantum meruit—all stemming from MCN's failure to reimburse Z-Modular for the costs it purportedly incurred in performing the work it completed under the contracts. In response, MCN has raised five counterclaims, essentially arguing that Z-Modular, not MCN, breached the contracts when it failed to adhere to their original terms, misrepresented its experience and ability to perform the work, and neglected to obtain the proper licenses.

Before the Court are the parties' motions for summary judgment on these various claims and counterclaims.  For the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** Z-Modular's motion for summary judgment and **GRANT** MCN's cross-motion.[1]  All of the claims and counterclaims are barred by the relevant statutes of limitations, and D.C. courts' narrow application of equitable tolling and equitable estoppel principles offers no safe harbor.  Accordingly, summary judgment is entered for MCN and partially entered for Z-Modular, and the case is **DISMISSED**.

## BACKGROUND

## I.   Factual Background[2]

MCN is a D.C.-based construction company that offers general contracting, construction management, and design-build services.   In November 2016, the D.C. government awarded MCN two contracts to build short-term family housing units in Wards 7 and 8.  Hoping to reduce costs, the government asked MCN to consider "modular" construction for the Ward 7 and Ward 8 projects rather than a "stick built" approach.  To that end, MCN solicited proposals from companies that claimed to have experience in constructing modular systems.  Z-Modular, a provider of modular building and services, won MCN's bid.

Thus, in August 2017, MCN and Z-Modular entered into two written subcontracts,

---

[1]   While summary judgment on MCN's counterclaims is entered in Z-Modular's favor, Z-Modular is not entitled to the partial summary judgment that it requests on its own four claims.

[2]   "Because the Court is dealing with Cross-Motions, it cannot set forth the facts in the light most favorable to the non-moving party."   *Strobos v. RxBio, Inc.*, 251 F. Supp. 3d 221, 224 (D.D.C. 2017). Instead, the Court offers only the undisputed background here, and will detail specific relevant facts within the analysis sections below.

one covering the Ward 7 project and the other covering Ward 8.  *See* Z-Modular Mot. Summ J., Ex. 1 [Dkt. #29-5] ("Ward 7 Subcontract"); *id.*, Ex. 2 [Dkt. #29-6] ("Ward 8 Subcontract").  The two subcontracts essentially provided that Z-Modular would design and fabricate custom housing modules offsite and deliver them to D.C for assembly and installation.  As originally envisioned, Z-Modular's scope of work under the subcontracts was comprehensive, requiring it to furnish "complete modular units" that included "the steel frame or chassis, subfloors, floors, doors, interior partitions, windows, finishes, cabinetry, tile, countertops, plumbing, electrical, mechanical and HVAC equipment and systems within each unit, drywall, ceilings, lights, etc."  Z-Modular Resp. to MCN Stmt. of Facts [Dkt. #3-1] ¶ 10(b).  Z-Modular was also responsible for numerous tasks once the modules were installed onsite, including electrical, mechanical, and plumbing services.  For each project, the parties agreed that Z-Modular would "substantially complete[]" its assigned work no later than March 16, 2018.  Ward 7 Subcontract § 9.3; Ward 8 Subcontract § 9.3.  In turn, MCN would pay Z-Modular according to a schedule of performance milestones: 15% upon execution of the subcontracts, 35% upon the completed fabrication of one-half of the modular units, 17.5% upon the completed fabrication of the second half of the modular units, 17.5% upon installation of all modular units, and the remaining 15% upon full completion.  Ward 7 Subcontract § 11.2; Ward 8 Subcontract § 11.2.

Although significantly delayed, MCN made the initial 15% payments in December 2017.  Z-Modular, which had already been given the go-ahead to proceed, continued its expected scope of work.  However, by January 9, 2018, Z-Modular had built only a single

3

chassis. Z-Modular Resp. to MCN Stmt. of Facts ¶ 37. By mid-February 2018, it had not

yet hired sub-subcontractors to complete the fit-out and finish for the modular units or to

perform the mechanical rough-in work assigned to Z-Modular under the subcontracts. *Id.*

¶¶ 35–36. And by March 1, Z-Modular had completed none of the 144 total modules

anticipated for both projects. *Id.* ¶ 38. Concerned by this pace of progress, MCN contacted

Z-Modular on March 9, 2018, to discuss Z-Modular's performance. Although the parties

now dispute whether that discussion amounted to a contract modification, the resulting

arrangement was that Z-Modular would fabricate and deliver only the structural frame (i.e.,

the chassis) for the modular units, complete with subfloors, exterior framing, and

sheathing. *See, e.g.,* Z-Modular Mot. Summ. J., Ex. 5 [Dkt. #29-9]. According to Z-

Modular, MCN also agreed that if push came to shove, it would accept just the chassis

without any exterior framing or sheathing. Z-Modular Resp. to MCN Stmt. of Facts ¶ 43.

As for the other tasks assigned to Z-Modular under the subcontracts, MCN would perform

those tasks itself or engage other subcontractors to complete them. MCN Resp. to Z-

Modular Stmt. of Facts [Dkt. #34-1] ¶ 7.

In April 2018, Z-Modular made its first delivery of modules to MCN, which

included the chassis, subfloor, and exterior framing and sheathing components for one

modular unit. Z-Modular Resp. to MCN Stmt. of Facts ¶ 41. Z-Modular's final delivery

of modules was made over three months later, on August 2, 2018. *Id.* ¶ 42. Most of the

delivered modules included the structural frame and subfloor but did not include exterior

framing or sheathing. *Id.* ¶¶ 42–43. All in all, of the original scope of work contemplated

by the subcontracts, Z-Modular performed only the following: engineering and design of

the modules; construction of the chassis for the modules, all of which came with subflooring but only some of which had exterior framing and sheathing installed; transportation of the chassis to the project sites in D.C.; and erection of the chassis into the overall building structure. *Id.* ¶ 44.

In July 2018, Z-Modular invoiced MCN for the work it completed on the Ward 7 and Ward 8 projects. For Ward 7, Z-Modular submitted an invoice totaling $3,123,127,80; for Ward 8, it invoiced $3,876,793.95, followed by another invoice for $945,559.50 in early September. *Id.* ¶ 46. According to Z-Modular, these invoices represented its total costs for the tasks it ended up performing, although as MCN pointed out, the invoiced amounts came oddly close to what the parties had agreed would be Z-Modular's original compensation under the subcontracts. *Id.* ¶¶ 12–13. In the ensuing weeks, MCN and Z-Modular exchanged several emails regarding these invoice amounts. In an email from August 28, 2018, MCN told Z-Modular that it would treat Z-Modular "fair[ly]" and "pay what is due," but added that Z-Modular "cannot bill for the whole scope of work when [it] effectively ... did less than 40%." Z-Modular Opp'n to MCN Mot. Summ. J., Ex. 1 [Dkt. #35-4] ("Aug. 2018 Boustany Email"). The parties continued their attempts to "settle" in September and October, *id.*, but apparently reached an impasse by October 17. This lawsuit followed.

## II.     Procedural Background

Z-Modular initially sued MCN in December 2018, raising the same four claims it asserts in the current action, as well as two others. *See Dist. of Columbia ex rel. Z.-Modular, LLC v. MCN Build, Inc.*, No. 18cv2947 (filed Dec. 14, 2018). In January of the

following year, MCN answered Z-Modular's initial complaint and counterclaimed for breach of contract. Both parties then moved for summary judgment.

In July 2021, however, this Court flagged jurisdictional deficiencies in Z-Modular's allegations and offered Z-Modular a chance to amend its complaint to correct them. The motion that followed spawned another round of briefing in which the parties contested whether Z-Modular could genuinely claim diversity of citizenship. Ultimately agreeing with MCN that Z-Modular could not establish diversity jurisdiction, I dismissed Z-Modular's case in September 2021, along with MCN's counterclaims, for lack of independent and pendent jurisdiction. *Dist. of Columbia ex rel. Z-Modular, LLC v. MCN Build, Inc.*, 2021 WL 43118241, at *5 (D.D.C. Sept. 23, 2021).

On September 27, 2021, four days after the dismissal of its first suit, Z-Modular filed the present action. Its complaint asserts four claims against MCN, two for breach of contract (Counts I and II) and two for quantum meruit (Counts III and IV), each pegged to the two subcontracts. After I denied MCN's motion to dismiss, MCN answered Z-Modular's complaint on August 10, 2022, and included the following counterclaims: breach of contract (Counts I and II), fraudulent inducement (Count III), negligent misrepresentation (Count IV), and violation of D.C.'s licensing laws (Count V). In March and April 2023, the parties each moved for summary judgment. *See* Z-Modular's Mem. P. & A. Supp. Mot. Summ J. [Dkt. #29-2]; MCN's Mem. P. & A. Supp. Mot. Summ J. [Dkt. #33-1] ("MCN Mot."). Those motions are fully briefed and ripe for decision. *See* Def.'s Mem. P. & A. Opp'n to Pl.'s Mot. Summ. J. [Dkt. #34] ("MCN Opp'n"); Z-Modular's Mem. P. & A. Opp'n to MCN's Mot. Summ. J. [Dkt. #35] ("Z-Mod Opp'n"); Z-Modular's

Reply Supp. Mot. Summ. J. [Dkt. #36]; Def.'s Reply Mem. Supp. Mot. Summ. J. [Dkt. #37].

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *See id.* at 248. A dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

"When faced with cross-motions for summary judgment, the Court must review each motion separately … to determine whether either of the parties deserves judgment as a matter of law." *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 245 (D.D.C. 2018) (internal quotation marks omitted). If the court decides, after review of the first motion, that the movant is not entitled to summary judgment, "it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent." *Id.* (internal quotation marks omitted).

With this sequential approach in mind, I will first examine MCN's cross-motion

seeking summary judgment on Z-Modular's four claims (Section I, *infra*).  I will then

assess Z-Modular's motion for summary judgment on MCN's counterclaims (Section II,

*infra*).   As explained below, I have concluded that all of the parties' claims and

counterclaims are time-barred and cannot be saved by resort to equitable tolling or estoppel

principles.

## I.    Summary judgment is appropriate on Z-Modular's claims because they are time-barred.

I begin with MCN's argument that all of Z-Modular's claims are time-barred,

entitling it to summary judgment right out of the gates.  This argument has two components,

first requiring me to decide which statute of limitations applies and then asking me to

identify when the claim accrued.  Because the parties answer these questions differently

for each set of Z-Modular's claims, those claims are taken in turn below.

### A.    Z-Modular's breach of contract claims (Counts I and II) are untimely.

#### 1.    The three-year statute of limitations applies because the subcontracts' predominant purpose is the provision of services.

MCN first argues that Z-Modular's claims are untimely because they are subject to

a three-year limitations period that has long since expired.  It contends that this three-year

period applies because the subcontracts at issue are for custom construction services, not,

as Z-Modular claims, for the sale of goods.  In turn, Z-Modular counters that while the

subcontracts may contemplate design-build tasks, the parties' ultimate bargain was for the

sale of moveable goods: modular units fabricated offsite and delivered to D.C. for

assembly.  For that reason, Z-Modular concludes, the four-year statute of limitations

supplied by D.C.'s Uniform Commercial Code ("UCC"), D.C. Code § 28:2-725, should

apply to its breach of contract claims, instead of the ordinary three-year statute of limitations for common law contract rights, *see id.* § 12-301(7). I disagree.

To be sure, the UCC defines the category of "goods" broadly. *See Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 580 (7th Cir. 1976).[3] It "means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." D.C. Code § 28:2-105(1). This definition encompasses, by its own terms, not only products made to a buyer's specifications but also those that are "moveable" at some critical point. *See id.*, cmt. 1 ("The definition of goods is based on the concept of moveability[.]"). For custom (as opposed to off-the-shelf) goods, that critical point—i.e., when identification to the contract occurs—is "at the first step of production." *Ritz-Craft Corp. v. Stanford Mgmt. Grp.*, 800 F. Supp. 1312, 1317 (D. Md. 1992); *accord Little v. Grizzly Mfg.*, 636 P.2d 839, 842 (Mont. 1981). If the product is moveable at that time, it falls within the definition of "goods," and the UCC governs. *Ritz-Craft*, 800 F. Supp. at 1317.

MCN does not dispute this statement of the law. Nor, indeed, does it accurately contest that the modules that Z-Modular provided—or was supposed to provide under the subcontracts—were moveable "when the first step of production [was] made with the raw materials intended to be finally worked into the goods required." *Little*, 636 P.2d at 842 (internal quotation marks omitted). Instead, MCN maintains that while parts of the subcontracts admittedly involved the sale of moveable goods (i.e., the modules), the

---

[3] Given the paucity of D.C. law involving application of the UCC and the "predominant purpose" test (*see infra*), the Court relies on persuasive out-of-state authority.

contracts' predominant purpose was to provide design-build construction services.  In other words, it says, the test for whether the UCC applies is not whether the subcontracts contemplated the sale of goods *in vacuo*, but whether "their predominant factor, their thrust, their purpose … [was] the rendition of service, with goods incidentally involved, … or [was] a transaction of sale, with labor incidentally involved."  *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974); *see Jackson v. Culinary Sch. of Wash.*, 811 F. Supp. 714, 725 (D.D.C. 1993) (adopting predominant purpose test articulated in *Bonebrake*).  In making this "predominance" determination, courts typically emphasize "(1) the language of the contract, (2) the nature of the business of the supplier, and (3) the intrinsic worth of the materials involved."  *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 460 (4th Cir. 1983) (footnotes omitted).  Courts also find it "telling" whether the "gravamen" of the complaint centers on an unsatisfactory service performance or, instead, the furnishing of deficient goods.  *Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 834 (4th Cir. 1998); *accord DeGroft v. Lancaster Silo Co.*, 527 A.2d 1316, 1323 (Md. Ct. Spec. App. 1987).[4]

---

[4]   "Although whether a transaction predominantly involves goods or services is ordinarily a question of fact for the jury[,] the jury should only resolve this issue if there is a true factual dispute, not if the division between goods and services merely involves a close call."  *Cranpark, Inc. v. Rogers Grp., Inc.*, 98 Fed. App. 563, 568–569 (6th Cir. 2012) (internal quotation marks omitted); *accord Aliki Foods, LLC v. Otter Valley Foods, Inc.*, 726 F. Supp. 2d 159, 166 (D. Conn. 2010); *Vitrum Indus. Lt. v. Arcadia Inc.*, 2021 WL 2360, at * (W.D. Wash. Apr. 20, 2021).  The parties here do not raise any underlying factual dispute impacting the predominance question, and indeed, both seem to assume this is a question for the Court to resolve as a matter of law.  At any rate, courts regularly decide at the summary judgment stage whether a hybrid contract is primarily one for goods or services.  *See Grimes v. Young Life, Inc.*, 2017 WL 5634239, at *4 (D.S.C. Feb. 17, 2017); *Brooks v. Serv. Am. Corp.*, 2007 WL 98475, at *2 (W.D. Wash. Jan. 9, 2007); *Heitman Steel Prods., Inc. v. Compuware Corp.*, 2000 WL 6211, at *6 (N.D. Ohio Feb. 15, 2000); *see also Princess Cruises*, 143 F.3d at 833 ("Because the facts in this case are sufficiently developed and undisputed, it is proper for the Court to determine … whether the GE-Princess transaction was a contract for the sale of goods[.]").  This Court sees no reason not to follow suit.

Here, almost all of the factors tip heavily in MCN's favor.  Only the second factor—the nature of Z-Modular's business—edges in Z-Modular's direction, and even then, it has little bearing on this case.  *Cf. Princess Cruises*, 143 F.3d at 833.  After all, while Z-Modular's current website touts a menu of two "repeatable" and "scalable" modular "products," the subcontracts here involved from-scratch design, engineering, and fabrication of fully bespoke modular units, plus a plethora of other construction tasks.[5]  *Cf. Pearl Invs., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 353 (D. Me. 2003) (explaining that the "development of a software system from scratch primarily constitutes a service," whereas contracts that involve "preexisting software, albeit with custom modifications or upgrades," are primarily for goods); *Sys. Am., Inc. v. Rockwell Software, Inc.*; 2007 WL 218242, at *5 (N.D. Cal. Jan. 26, 2007) (similar); *KSM Assocs. v. ACS State Healthcare, LLC*, 2006 WL 847786, at *5 (E.D. Pa. 2006) (similar); *Smart Online, Inc. v. Opensite Techs., Inc.*, 2003 WL 21555316, at *4 (N.C. Super. Ct. June 17, 2003) (similar); *see also Multi-Tech Sys., Inc. v. Floreat, Inc.*, 2002 WL 432016, at *3 (D. Minn. Mar. 18, 2002) ("UCC does not apply to an agreement to design and develop a product.").  In short, to whatever extent Z-Modular's business can now be described as the sale of stock, "repeatable" modules, that was not the business for which Z-Modular was hired when it agreed to the Ward 7 and 8 projects.

Meanwhile, the other predominance factors weigh clearly on MCN's side.  As for the first factor, the subcontracts do not use terms like sale, buyer, or seller but instead use

---

[5]  Z-Modular, https://www.z-modular.com/ (last visited Apr. 2, 2024).

"project," "construction," "contractor," and "subcontractor." *See Grimes*, 2017 WL 5634239, at *3 (finding that services predominated where contract language was associated with construction services); *DeGroft*, 527 A.2d at 1323 (same). They take the form not of a purchase order, but of a standard, industry-recognized construction contract—entitled, no less, "Agreement … for a Design-Build Project." *See Heidtman Steel Prods., Inc. v. Compuware Corp.*, 2000 WL 621144, at *6 (N.D. Ohio Feb. 15, 2000) (finding that services predominated where title of contract was "Agreement for Technical Personnel Services"); *see also Coakley*, 706 F.2d at 461 (acknowledging that "standard form contracts are virtually universal for construction (i.e., generally, service) contracts"). Their compensation structure is tied primarily to service-related milestones, namely, fabrication of the modules. And most of the work enumerated in the subcontracts clearly contemplates service functions, including the design, engineering, construction, and delivery of the modules, as well as onsite tasks such as HVAC installation and electrical work. *See Princess Cruises*, 143 F.3d at 833 (finding that services predominated where the work consisted primarily of services). These kinds of provisions, even when viewed in the light most favorable to Z-Modular, all but demand a finding that services, not goods, predominate.

The remaining factors, too, lead to the same conclusion. As for the third factor, the very fact that the "intrinsic worth" of materials cannot be determined from the subcontracts—because Z-Modular "blend[ed]" all work into a lump-sum price—"confirm[s] that services … predominated in the transaction." *Id.* at 834; *cf. id.* (finding significant that the parties did not "separately itemize[] the value of the materials" and

instead chose to "blend the cost of the materials into the final price"); *see DeGroft*, 527 A.2d at 1323 (collecting cases for the proposition that the "absence of allocation between labor and materials" suggests the "UCC d[oes] not apply"); *see also* Z-Modular Resp. to MCN Stmt. of Facts ¶ 37 (Z-Modular admitting it did not have committed pricing for materials or performance when submitting pre-project cost estimates).  And with respect to the last factor, the "gravamen" of MCN's counterclaims could not be plainer.  Though it no doubt complains about deficiencies in the delivered modules, those deficiencies—and MCN's accompanying requests for damages—all stem from Z-Modular's alleged failure to perform the services it promised under the subcontracts: on-time delivery, fit-out and finish, and almost all of the onsite work. *See, e.g.,* Ans. & Counterclaim [Dkt. #23] ¶¶ 105–106, 115–119, 141–143.  Simply put, MCN's causes of action center on Z-Modular's unsatisfactory *service* performance, not on defective goods per se.

For its part, Z-Modular does not contest the facts underlying this outcome.  It does not, for example, maintain that the subcontracts' terms, terminology, or form are different than what MCN says they are, nor does it dispute that its original scope of work involved mostly service functions.  Instead, Z-Modular argues that almost none of these service functions had any real value except in the context of the final good being furnished.  In other words, the parties' bottom-line agreement was for moveable, tangible modules.  The fact that countless services were required to create, deliver, and install those modules does not transform the subcontracts into ones for services, or so Z-Modular concludes.  But this argument misconstrues the predominant purpose test as courts have uniformly applied it.  A contract may contemplate a tangible end product, as the subcontracts here do, but the

13

relevant question is what the contract involves *more* of—what "is being purchased in the main." *Data Proc. Servs., Inc. v. L.H. Smith Oil Corp.*, 92 N.E.2d 314, 319 (Ind. Ct. App. 1986). If the answer is "the purchase of labor and the knowledge, skill, and ability of the contracting party," then services predominate and the "deliverables" are only incidental. *Niagara Bottling, LLC v. Rite-Hite Co.*, 2019 WL 1768875, at *7 (C.D. Cal. Feb. 11, 2019) (internal quotation marks omitted).

So it is here. MCN did not bargain for off-the-shelf modular units. It did not even bargain for customized versions of those units, or choose from a menu of modules that it could modify or upgrade to suit its needs. *Cf. Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 655 (7th Cir. 1998) (finding that a contract was one for goods because customization was only a small part of the contract, as when someone buys a car for $20,000, which includes $1,000 of customized features). Instead, MCN contracted for the design, engineering, and fabrication of several new types of modules that Z-Modular had never before created and had to develop from scratch, from concept to realization. *See* MCN Mot., Ex. 12 [Dkt. #33-15] (Z-Modular corporate designee admitting that Z-Modular "didn't even have a plant" when it agreed to the Ward 7 and 8 projects); *see also* Z-Mod Opp'n, Ex. 6 [Dkt. #35-9] (describing the high number of "design, engineering, and fabrication hours" that Z-Modular put into the projects). MCN then requested that Z-Modular undertake a host of other construction tasks once the modules were delivered onsite. *See* Ward 7 Subcontract, Ex. A; Ward 8 Subcontract, Ex. B. These features of the subcontracts plainly reveal that MCN was buying Z-Modular's knowledge, skills, and labor in the main, not the raw materials from which the modules were constructed.

Indeed, these features are precisely why this case is distinguishable from the handful of cases in which contracts for modular units were found to be governed by the UCC. In most of those cases, the contracts seemed to involve the purchase of preexisting or predesigned modular units, either as advertised or with limited customization. *See Gulf Coast Fabricators, Inc. v. Mosley*, 439 So.2d 36, 37 (Ala. 1983) (contract for construction of "new building," which consisted entirely of "a prefabricated steel structure manufactured and sold by PASCOE Steel," was contract for goods); *Burnham v. Mark IV Homes, Inc.*, 441 N.E.2d 1027, 1029, 1031 (Mass. 1982) (contract for nine modular homes, which were purchased after plaintiff "looked at a model of these homes located on [a] lot, and then placed orders for the units to be delivered," was contract for goods). Other cases involved the manufacture, delivery, and "finish work" of "prefabricated" modular units, but none of the onsite construction tasks. *See Ritz-Craft*, 800 F. Supp. at 1314, 1317; *see also Cates v. Morgan Portable Bldg. Corp.*, 591 F.2d 17, 19–20 (7th Cir. 1979) (affirming, without any real inquiry, the district court's application of UCC to "the purchase of two modular housing units").

Here, by contrast, the subcontracts are far more akin to the "paradigmatic example[]" of a contract with an artist for a painting," *Herren Farms, LLC v. Martin*, 615 F. Supp. 3d 429, 433 (W.D. Va. 2022), or the "hypothetical situation where a publisher commissions a novel," *Sys. Am.*, 2007 WL 218242, at *5 n.10, which are both situations where services predominate. *See also Bonebrake*, 499 F.2d at 960; *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 432 n.5 (S.D.N.Y. 1996). In those situations, as in this one, "though a tangible end product ... within the definitions of 'goods' was produced"—a painting, a

15

novel, or a module—the essential bargain was for the other party's "skill in developing a [product] to meet … specific needs." *Wharton Mgmt. Grp. v. Sigma Consultants, Inc.*, 1990 WL 18360, at *3 (Del. Super. Ct. Jan. 29, 1990), *aff'd*, 1990 WL 168240 (Del. Sept. 19, 1990). Accordingly, the predominant purpose of the subcontracts is the rendition of services, and the three-year, not four-year, statute of limitations applies.

### 2.    Z-Modular's breach of contract claims accrued before September 27, 2018.

The second component of MCN's timeliness argument requires deciding when Z-Modular's breach of contract claims accrued, i.e., when the three-year limitations period began to run. As Z-Modular filed this suit on September 27, 2021, its claims will be timely only if they accrued on or after September 27, 2018; any earlier, and Z-Modular's claims are time-barred. This holds true even though Z-Modular filed its first lawsuit on these same claims in December 2018, since "District of Columbia law does not contemplate the invocation of equitable tolling … following a dismissal without prejudice." *Sayyad v. Fawzi*, 674 A.2d 905, 906 (D.C. 1996); *see Dupree v. Jefferson*, 666 F.2d 606, 610–611 (D.C. Cir. 1981) (explaining that a statute of limitations is not tolled during the pendency of an action dismissed without prejudice, since "a dismissal without prejudice does not operate as an adjudication upon the merits, and thus leaves the situation the same as if suit had never been brought").

The parties advance different dates for when they believe Z-Modular's breach of contract claims accrued in this case. MCN insists the date of accrual is sometime between July 9, 2018, when Z-Modular submitted most of its invoices, and mid-September of that

same year, by which time Z-Modular's invoices had been due and owing for many weeks

with no payment from MCN.  Z-Modular, in contrast, contends that its claims accrued no

earlier than October 11, 2018, when—in Z-Modular's telling—MCN refused for the first

time to pay any portion of Z-Modular's costs.  *See* Z-Mod Opp'n, Ex. 5 [Dkt. #35-8] ("Oct.

2018 Boustany Email").  In so arguing, Z-Modular essentially claims that it was strung

along by MCN's emails in August and September promising to "settle" with Z-Modular

and "pay what is due."  Aug. 2018 Boustany Email.

      MCN again has the better argument on this point.  In breach of contract cases, the

cause of action usually "accrues … at the time of the breach," which is when a party "fail[s]

to perform all or any part of what is promised in a contract."  *Medhin v. Hailu*, 26 A.3d

307, 310 (D.C. 2011) (internal quotation marks omitted).  Where, however, "the

relationship between the … [breach] and the [breaching party's] conduct is obscure, the

so-called 'discovery rule' will apply, such that the claim does not accrue until the claimant

knows or by the exercise of reasonable diligence should know of (1) the [breach], (2) its

cause in fact, and (3) some evidence of wrongdoing."  *Id.*  The discovery rule does not

require that a plaintiff "have knowledge of the precise breadth or nature" of its injury, *Brin

v. S.E.W. Invs.*, 902 A.2d 784, 792 (D.C. 2006), and indeed, "a right of action may accrue

before the plaintiff becomes aware of all of the relevant facts," *Hendel v. World Plan Exec.

Council*, 705 A.2d 656, 661 (D.C. 1997).  Rather, "the law of limitations requires only"

that the plaintiff know "of *some injury*," *Colbert v. Georgetown Univ.*, 641 A.2d 469, 473

(D.C. 1994)—which, in a breach of contract case, is whenever the plaintiff has actual or

inquiry notice that it is "receiving something substantially less or different from that for

which [it] bargained," *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C. 1970).

Z-Modular relies on the discovery rule here to argue that it had no evidence of wrongdoing—and thus could not have discovered MCN's breach—until MCN's October 11 email, which Z-Modular characterizes as "the first time MCN gave any indication that it did not intend to pay." Z-Mod Opp'n 9. But at best, this characterization misunderstands the discovery rule.[6]  At worst, it is misleading!  In the same August 2018 email that Z-Modular identifies as proof that it had been deceived into believing it would be paid, MCN starkly rejected Z-Modular's attempt "to bill for the whole scope of work when effectively [it] did less than 40%." Aug. 2018 Boustany Email; *see id.* (MCN disputing Z-Modular's costs on the ground that "Structural Engineering is not even 1% of the total value of a project in general").  Internal emails, too, at least hint at Z-Modular's awareness that MCN was unlikely to pay the invoiced amounts.  In an email dated September 4, 2018, Z-Modular's accountant expressly remarked on "how long the invoices have been open" and voiced concern about the lack of "movement from MCN on the payment side." MCN Mot., Ex. 20 [Dkt. #33-23].  Three weeks later, on September 26, Z-Modular asked one of its subcontractors to "stop" the work they were doing because "they [MCN] haven't paid us yet." *Id.*, Ex. 21 [Dkt. #33-24]; *see* Z-Modular Resp. to MCN Stmt. of Facts ¶ 49

---

[6] To whatever extent Z-Modular views this email as the first time MCN refused to pay Z-Modular *at all* for its work, such evidence is irrelevant to the discovery rule.  The breach in this case is MCN's failure to pay "any part" of what was due under the subcontracts—not its failure to pay "all" of the amounts for which Z-Modular invoiced. *Medhin*, 26 A.3d at 310.  Thus, if Z-Modular knew at any point before September 27, 2018, that it would not receive all of the payments it requested—because, for example, it expected that MCN would try to "negotiat[e]" with Z-Modular given that its "bills were higher than [] expected," Z-Mod Opp'n 8—the discovery rule would charge Z-Modular with notice of MCN's breach based on Z-Modular's awareness that it would "receiv[e] something less … [than] that for which [it] bargained," *Fowler*, 262 A.2d at 347.

(purporting to dispute MCN's description of this email, yet agreeing that the email shows

that Z-Modular "directed that [the subcontractor] should hold off on further work until …

MCN makes payment").  Especially when viewed together, these emails make clear that

Z-Modular had at least "some" knowledge of MCN's breach before September 27, 2018,

even if it "was not [yet] aware of all of the relevant facts." *Hendel*, 705 A.2d at 661.

Because that "quantum of knowledge" is sufficient in this case to put Z-Modular on notice

of its breach of contract claims, *Brin*, 902 A.2d at 793, those claims are now time-barred.

### B.    Z-Modular's quantum meruit claims (Counts III and IV) are untimely because they accrued before September 27, 2018.

In a similar vein, Z-Modular's quantum meruit claims are also time-barred for

having accrued well over three years ago.  On this front, at least, the parties agree that the

"statute of limitations for a quantum meruit action in D.C. is three years." *Glenn v. Fay*,

381 F. Supp. 3d 130, 137 (D.D.C. 2017) (citing D.C. Code § 12-301(8)).  They also agree

that the standard that governs when a quantum meruit claim accrues is "when the defend-

ant is unjustly enriched," at which point "the plaintiff's last service has been rendered and

compensation has been wrongfully withheld." *New World Commc'ns, Inc. v. Thompsen*,

878 A.2d 1218, 1220, 1223 (D.C. 2005).  The parties disagree, however, on the date of

accrual in this case—a question "for the district court to resolve." *Vila v. Inter-Am. Inv.,

Corp.*, 570 F.3d 274, 284 (D.C. Cir. 2009); *see Loumiet v. United States*, 968 F. Supp. 2d

142, 152–153 (D.D.C. 2013) (deciding "question of accrual" as a "matter of law" when the

"[p]laintiff fails to identify any factual dispute affecting the accrual of the limitations

19

period").[7]  MCN, for its part, again argues for a date in August or mid-September 2018, since by that point, Z-Modular's invoices had been due and left unpaid for many weeks. In turn, Z-Modular sticks with an accrual date of October 11 on the theory that MCN did not "unequivocally indicate[] its intention not to pay" until that time. *Vila v. Inter-Am Inv. Corp.*, 596 F. Supp. 2d 28, 33 (D.D.C. 2009).

Z-Modular is at least correct that some courts in our district have articulated the test for accrual as not merely when "payment is refused," but when payment is "unequivocally" refused. *Id.*; *see also Glenn*, 381 F. Supp. 3d at 137; *Mace v. Domash*, 2008 WL 11417279, at *5 (D.D.C. Dec. 1, 2008).  And the court's analysis in the first case to have done so, *Vila v. Inter-Am Inv. Corp.*, 536 F. Supp. 2d 41 (D.D.C. 2008), admittedly contains language favorable to Z-Modular's position here.  *See id.* at 51–52 (concluding that the plaintiff's quantum meruit claims did not accrue until he "was told, without qualification, that … he would not be compensated at all," whereas prior communications suggested "he would receive at least some compensation").  But even assuming the "unequivocal refusal" test is the right one—and I observe that no D.C. court has adopted such a standard—*Vila*'s analysis is unpersuasive.  It assumes, as Z-Modular does, that a defendant can qualify its otherwise clear refusal of payment by invoking the prospect of some future compensation for part, but not all, of the plaintiff's work.  So in this case, as Z-Modular urges, MCN's email on August 28 telling Z-Modular it "cannot bill for the whole scope of work when

---

[7]  Although the question of when accrual occurred in a particular case is usually a question for the jury, *see Brin*, 902 A.2d at 795, the parties here agree on the probative facts underlying that question.  They also seem to agree that this question is one that the Court could and should resolve at summary judgment.

effectively [Z-Mod] did less than 40%," Aug. 2018 Boustany Email, suggests that Z-Modular could look forward to partial compensation in the future—meaning that MCN's August 28 refusal was "not sufficiently unequivocal to cause the unjust enrichment claim to accrue," *Vila*, 536 F. Supp. 2d at 51. But the mere suggestion that MCN may pay Z-Modular for some (but not all) of its work at some unspecified point in time does not toll the statute of limitations when, according to Z-Modular's own theory of its case, MCN was unjustly enriched as soon as it decided to keep *any* part of the $8 million for which Z-Modular had billed. *News World Commc'ns*, 878 A.2d at 1233 ("[T]he essence of a quantum meruit claim is ... the unjust enrichment of the defendant." (internal quotation marks omitted)). In other words, given that Z-Modular sought compensation for *all* of its work, not just part of it, MCN's August 28 email should be interpreted for what it is: a rejection of the invoices that Z-Modular had sent and a refusal of the specific compensation it had requested therein—compensation it now seeks in the current lawsuit.[8]

Underscoring this conclusion is the rule that "[a] statute of limitations cannot be unilaterally extended by a plaintiff making a new demand for payment when initial demands for payment have been unsuccessful." *Cunningham & Assocs. v. Dugan*, 909 A.2d 1001, 1003 n.3 (D.C. 1996). In context, Z-Modular's repeated requests for "resolution" after MCN rejected its "bill for the whole scope of work," Z-Mod Opp'n, Ex. 3 [Dkt. #35-

---

[8] Worth noting is that Z-Modular's preferred accrual date—October 11, 2018—relies on an email that, in many ways, is not meaningfully different from MCN's August 28 email repudiating Z-Modular's costs as invoiced. In the October 11 email, MCN again rejects Z-Modular's attempts to "close out" the invoices, but continues to agree to "meet and discuss settlement"—as it did in the August 28 email. *Compare* Oct. 11 Boustany Email, *with* Aug. 2018 Boustany Email. Z-Modular does not explain how this later email is somehow more "unequivocal" in its refusal to pay Z-Modular's invoices than the August 28 communication.

6]; Aug. 2018 Boustany Email, are best read as attempts to seek and negotiate a new payment once Z-Modular realized it would not be paid as billed.  These negotiation efforts, however, do not reset the statute of limitations.  *Accord GIV, LLC v. Int'l Bus. Machs. Corp.*, 2007 WL 1231443, at *3 (E.D. Va. Apr. 24, 2007) (rejecting argument that "continued negotiations" over payment "postpone when unjust enrichment occurs," since "[o]therwise, a party could indefinitely extend the accrual date for the statute of limitations simply by making periodic requests of another party"); *see also Birdsall, Inc. v. Tramore Trading Co.*, 771 F. Supp. 1193, 1198 (S.D. Fla. 1991) ("If mere settlement negotiations tolled the time for filing, the statute of limitations would be of little value.").  Nor do they supplant the "sufficiently unequivocal" repudiation of Z-Modular's requested compensation in August 2018, more than three years before this suit was filed.  Z-Modular's quantum meruit claims are therefore time-barred and must also be tossed out at summary judgment.

## II. Summary judgment is appropriate on MCN's counterclaims because they are time-barred.

Last for this Court to resolve are MCN's counterclaims, which, as it turns out, are also barred by the applicable statutes of limitations.  As MCN agrees, all five of its counterclaims are subject to a three-year limitations period, *see* D.C. Code. § 12-301(7), (8), and all accrued sometime between November 2017 and April 2019, *see* MCN Resp. to Z-Modular Stmt. of Facts ¶¶ 98, 102.  Because MCN did not file these counterclaims until August 10, 2022, they are *untimely* unless MCN can show that equitable estoppel or

equitable tolling should postpone the limitations cut-off dates.  Unfortunately, MCN falls short of making that showing!

This Court, and any other court applying D.C. law, are "bound by [D.C.'s] strict adherence to statutes of limitations." *Sayyad*, 674 A.2d at 906.  Indeed, "the District of Columbia is one of a minority of jurisdictions that has not adopted a general equitable 'saving' statute to toll statutes of limitations." *East v. Graphic Arts Indus. Joint Pension Trust*, 718 A.2d 153, 156 (D.C. 1998).  Because of that, courts in this jurisdiction have consistently "[r]eject[ed] … application of equitable tolling on a case-by-case basis," lest they "exceed their prescribed role by providing a remedy where the legislature has determined that none should lie." *Sayyad*, 674 A.2d at 906.  Only "two limited exceptions to [this] generally strict" rule have been recognized: the lulling doctrine and the discovery rule. *East*, 718 A.2d at 156.  Neither, however, saves MCN's counterclaims.  How so?

The lulling doctrine, which is a theory of equitable estoppel, prevents a defendant (in this case, counter-defendant Z-Modular) from asserting a statute of limitations defense "if it appears the defendant has done anything that would tend to lull the plaintiff into inaction" until after the limitations deadline has passed. *Id.* at 156–157 (internal quotation marks omitted).  The lulling doctrine applies "narrowly," *id.* at 157, and requires a finding that the defendant did "something that amounted to an affirmative inducement to plaintiff[] to delay bringing action," *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986) (internal quotation marks omitted).  A defendant's "mere silence" or "failure to disclose" usually does "not rise to the level of affirmative misconduct." *East*, 718 A.2d at 156.  Still more, the misconduct must generally be "designed" to prevent a plaintiff from litigating in time.

23

*William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1192 (D.C. 1980); *see also Drake v. McNair*, 993 A.2d 607, 619 (D.C. 2010); *cf. Dove v. Wash. Metro. Area Transit Auth.*, 402 F. Supp. 2d 91, 97 (D.D.C. 2005) (finding that plaintiff's equitable estoppel argument failed because "plaintiff presented no argument suggesting that the defendant intentionally misled the plaintiff"). "[T]o show a 'lulling,' concrete evidence" is needed to "clearly establish[] that such activity occurred." *Jones v. Gov't Emps. Ins. Co.*, 621 A.2d 845, 847 (D.C. 1993).

MCN offers no "concrete evidence" of lulling in this case. It is true, as MCN argues, that Z-Modular's jurisdictional missteps in the first lawsuit dealing with these claims and counterclaims are part of the reason why MCN's counterclaims are now untimely. It is also true that this Court has described those missteps as "indicative of bad faith, or gross incompetence," rather than "the product of excusable neglect." *Dist. of Columbia ex rel. Z-Modular*, 2021 WL 4318241, at *4. But none of this amounts to an "affirmative inducement" on Z-Modular's part intending to prevent MCN from filing its counterclaims within the applicable periods. *Bailey*, 516 A.2d at 937. On the contrary, MCN's untimely filing is best described as an incidental effect of Z-Modular's actions in the first lawsuit— as well as other delays naturally attendant to the litigation cycle and decisionmaking process—not as a deliberate, expected, or even direct result of those actions. Indeed, MCN's briefing on this point almost seems to concede this point. It conspicuously avoids suggesting that Z-Modular's actions—even if they did indicate bad faith or gross incompetence—were designed to mislead or lull, or did in fact mislead or lull, MCN into delaying its counterclaims. *See* MCN Opp'n 9 (failing to mention "lulling" doctrine but

describing "equitable estoppel" as when a defendant engages in "affirmative misconduct" that merely "works to the detriment of the claimant"). The lulling doctrine is therefore no help to MCN's counterclaims here.

Nor does the discovery rule spring into action. That rule, also described above, *see supra* Sec. I.B, "is designed to prevent the accrual of a cause of action before an individual can reasonably be expected to discover that he has a basis for legal redress." *Bussineau v. Pres. & Dirs. of Georgetown Coll.*, 518 A.2d 423, 430 (D.C. 1986). As several courts have appreciated, the discovery rule is not so much a doctrine of "equitable tolling," as MCN might call it, as it is a rule that governs when a claim accrues. *See Doe v. Exxon Mobil Corp.*, 2022 WL 3043219, at *11 (D.D.C. Aug. 2, 2022). Either way, though, it has no bearing on the outcome of MCN's counterclaims here. MCN does not contend that its untimely filing can be attributed to an inability to discover the factual basis for its suit. And without any other recognized "equitable tolling exception," *Johnson v. Marcheta Invs. Ltd.*, 711 A.2d 109, 112 (D.C. 1998), MCN is simply out of luck. Accordingly, MCN's five counterclaims are likewise time-barred, and summary judgment on them is entered in Z-Modular's favor.[9]

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART**

---

[9] The fact that MCN's counterclaims are time-barred would not have prevented this Court from construing them as a recoupment defense, which would have allowed MCN "to have [Z-Modular]'s claim[s] reduced or eliminated" if those claims went to trial. *King v. Barbour*, 240 F. Supp. 3d 136, 140 (D.D.C. 2017) (internal quotation marks omitted). As Z-Modular's claims are not going to trial, however, a recoupment defense is needless. Z-Modular has no prospect of recovery, so MCN has nothing from which to recoup.

Z-Modular's motion for summary judgment and **GRANTS** MCN's cross-motion.   An order consistent with this decision accompanies this Memorandum Opinion.

      **SO ORDERED.**

RICHARD J. LEON
United States District Judge
